**EQUITY OIL COMPANY, a corporation, Plaintiff,**

v.

**CONSOLIDATED OIL & GAS, INC., and Harry A. Trueblood, Jr., Defendants.**

**Civ. No. C–82–1208A.**

United States District Court, D. Utah, C.D.

June 28, 1983.

Glenn C. Hanni, Frank G. Noel, Strong & Hanni, Salt Lake City, Utah, for plaintiff.

Kent W. Winterholler, James M. Elegante, Parsons, Behle & Latimer, Salt Lake City, Utah, for defendants.

ORDER DISMISSING COMPLAINT

ALDON J. ANDERSON, Chief Judge.

On November 22, 1982, defendant Consolidated Oil & Gas, Inc. (Consolidated)

bought 522,000 shares of common stock of the plaintiff Equity Oil Company (Equity), in a privately negotiated purchase. The addition of this block to the 310,500 shares of Equity stock already owned by Consolidated put the defendant's holdings over the 5% of outstanding shares which triggers the filing requirement of section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d).[1] On November 23, 1982, Consolidated filed a Schedule 13D with the SEC, mailed a copy to Equity, and issued a press release announcing the filing of the 13D and summarizing part of its contents.

In reporting the purpose of the transaction, the 13D stated that Consolidated "intends to explore the possibility of combining" Equity and Consolidated through a statutory merger or exchange offer, but a "cash tender offer at this time is not considered to be an alternative." It also stated that Consolidated intended to limit further purchases of Equity stock to 9.9% of outstanding shares.

On December 13, 1982, Equity brought this action under sections 13(d) and 10(b) of the Securities Exchange Act, under Rule 10b–5, and under State common law, alleging misrepresentations and fraudulent omissions in the Schedule 13D and accompanying press release. Equity seeks to enjoin Consolidated from, *inter alia*, buying or selling Equity stock and voting the stock it owns, as well as to compel Consolidated to divest itself of the Equity shares it holds. On December 21, 1982, Consolidated amended its 13D to report this lawsuit, the stated intent of Equity's management not to combine with anyone, and Consolidated's intent not to pursue any of the possible courses disclosed in the initial filing until its status is determined by this action.

On January 31, 1983, Consolidated filed Defendant's Motion to Dismiss Plaintiff's Complaint and for Partial Summary Judgment based on the following grounds: (1) there is no private right of action under section 13(d) of the Securities Exchange Act; (2) plaintiff lacks standing to maintain these claims; (3) plaintiff failed to plead fraud with particularity as required by F.R. Civ.P. 9(b); (4) plaintiff has not stated a claim under state law; (5) the complaint alleges no basis for personal liability against defendant Harry A. Trueblood; (6) the amended filing has mooted allegations of certain omissions in the initial filing; (7) the assertion that the 13D filings contained material misstatements or omissions regarding a credit agreement between Consolidated and a group of lenders is untrue. The court heard oral arguments on the motion on April 4, 1983. After studying the memoranda and cases cited and after hearing the arguments presented, the court concludes that the complaint must be dismissed because (1) the plaintiff has no private right of action under section 13(d); (2) the plaintiff does not have standing to bring an action under Section 10(b) and rule 10b–5; and (3) this court retains no subject matter jurisdiction over the common law claim.

1. Section 13(d) was added to the Securities Exchange Act in 1968 by the Williams Act, Pub.L. No. 90–439, § 2, 82 Stat. 454 (1968). Subsection (d)(1) of this act provides as follows:

   (d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors— 15 U.S.C. § 78m(d)(1). Subsections (A) through (E) of subsection (d)(1) list the information to be included in the statement. By regulation the Commission has provided a form, Schedule 13D, on which the statement prescribed by statute is to be submitted. 17 C.F.R. §§ 240.13d–1 through 240.13d–101.

## I. NO PRIVATE RIGHT OF ACTION UNDER SECTION 13(d)

■ Plaintiff makes its first claim for relief under section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d). As the Supreme Court has noted, "this cause of action is not expressly authorized by the statute," *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 62, 95 S.Ct. 2069, 2078, 45 L.Ed.2d 12 (1975); rather plaintiff asserts an implied private right of action under section 13(d), which has been recognized in some circuits since 1971. *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). However, recently several district courts, following more recent analyses of implied rights of action by the Supreme Court, have rejected claims of an implied private right of action under this section. *See, e.g., Gateway Industries, Inc. v. Agency Rent A Car*, 495 F.Supp. 92 (N.D.Ill.1980); *Sta Rite Industries, Inc. v. Nortek, Inc.*, 494 F.Supp. 358 (E.D.Wis.1980); *Indiana National Corp. v. Rich*, 554 F.Supp. 864 (S.D.Ind.1982).

Until recent years the Supreme Court rather freely recognized implied rights of action under the federal securities laws. *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). However, in 1975 the Court articulated a far stricter standard that must be met before a private right of action would be inferred from a federal statute. In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Court identified four relevant factors that must be considered:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law ...?

(Emphasis in original) (citations omitted). More recently, the Court has modified the *Cort v. Ash* test to make the question of private rights of action one of strictly construing congressional intent:

It is true that in *Cort v. Ash, supra,* the Court set forth four factors that it considered 'relevant' in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort* are ones traditionally relied upon in determining legislative intent.

*Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979). *Touche Ross* denied a private right of action under section 17(a) of the Securities Exchange Act, concluding that there was no evidence of congressional intent to create such a remedy. In a contemporary case, the Court followed the *Touche Ross* analysis to find an implied right of action under Section 215 of the Investment Advisers Act, 15 U.S.C. § 80b–15 but to deny an implied right of action under section 206 of the same Act. 15 U.S.C. § 80b–6. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

The courts in *Gateway Industries, supra, Sta Rite Industries, supra,* and *Indiana National Corp., supra,* correctly applied the *Cort* analysis as clarified by *Touche Ross* and *Transamerica* to deny a private right of action under section 13(d).

First, it is clear that the plaintiff in this action is not a member of "the class for whose *especial* benefit the statute was enacted." The Williams Act, of which section 13(d) is a part, was enacted for the benefit of investors. The House Report emphasized that the act:

avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure *for the benefit of inves-*

*tors* while at the same time providing the offeror and management equal opportunity to fairly present their case.

H.R.Rep. No. 1711, 90th Cong., 2d Sess., 1, 3, *reprinted in* [1968] U.S.Code Cong. & Ad.News 2811, 2813 (emphasis added). Specifically, section 13(d) disclosure made "the relevant facts known so that shareholders would have a fair opportunity to make [investment] decisions." S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967). Thus, the class for whose especial benefit the statute was enacted was investors, not issuers or management. Plaintiff, however, asserts that the issuer is in the best position to assert the rights of the investors, since it receives a copy of Schedule 13D and has the knowledge and resources to check the schedule's accuracy. The court cannot accept this argument. Often the interests of management are contrary to the interests of shareholders, because management may have an interest in opposing a takeover attempt in order to perpetuate itself, while a merger or other combination with a 13(d) purchaser may be in the best interests of the shareholders. Under these circumstances, the court cannot conclude that the issuer stands in the shoes of the shareholder investors in bringing this action.

The second inquiry under *Cort* and the central inquiry under *Touche Ross* and *Transamerica,* is whether there is any indication of legislative intent to create a private right of action. The *Touche Ross* court focused on three factors to discern such intent: the language of the statute, the legislative history, and the statutory scheme. 442 U.S. at 569–74, 99 S.Ct. at 2485–88.

The language of section 13(d) reads in pertinent part:

Any person who, [after acquiring certain stock], is directly or indirectly the beneficial owner of more than 5 per centum of [certain stock] shall ... send to the issuer ... and file with the Commission, a statement containing ... information ... as the Commission may ... prescribe as

necessary or appropriate in the public interest or for the protection of investors.[2]

15 U.S.C. § 78m(d)(1). On its face the language reveals no intent to create a right of action on behalf of anyone. Nevertheless, under the *Touche Ross* analysis, the court must look further to determine whether the statutory language either creates a federal right in the plaintiff, as in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), or prohibits certain conduct for the benefit of the plaintiff, as in *J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *Touche Ross*, 442 U.S. at 569, 99 S.Ct. at 2485. Neither is the case in section 13(d), which only requires the purchaser to send a Schedule 13D to the SEC, securities exchanges, and the issuer. In this respect, section 13(d) is similar to section 17(a) of the Securities Exchange Act, another reporting section, which *Touche Ross* held not to create an implied private right of action. Further, like section 17(a), the language of 13(d) is forward-looking rather than retrospective, which also weighs against implication of a private right of action. 442 U.S. at 570, 99 S.Ct. at 2486. Thus, under the *Touche Ross* analysis, there is nothing in the language of section 13(d) which would lead this court to believe that Congress intended to create a private right of action under this section.

Neither does the legislative history support implication of a private right of action under section 13(d). Proponents of such implication have pointed to the remarks of Professor Israels in a submission to the hearings on the Williams Act:

Presumably we may assume that the Commission will be able to enforce the provisions of this Bill ... and of its rules thereunder by proceedings for injunction in the Federal Courts; and that under [*Borak*] a private litigant could seek similar relief before or after the significant fact such as the acceptance of his tender of securities.

---

**2.** *See* note 1, *supra,* where the text of section 13(d)(1) is set out more fully.

*Hearings on S. 510 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 90th Cong. 1st Sess. 67 (1967). However, the Supreme Court has rejected this comment as evidence of legislative intent to imply a private right of action in the Williams Act. When the defeated tender offeror in *Piper v. Chris Craft Industries*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), argued that since Congress was aware of *Borak* when it passed the Williams Act, "Congress was [also] aware that private actions were implicit in [the Williams Act]," the Court rejected such logic:

> [T]his conclusion places more weight on the passing reference to *Borak* than can be reasonably carried.... Only last Term we indicated that similar materials in the legislative history of the 1934 Act were of limited value. "Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or drafting of a bill are entitled to little weight."

430 U.S. at 31, and n. 20, 97 S.Ct. at 944, and n. 20 (*citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 204, n. 24, 96 S.Ct. 1375, 1386, n. 24, 47 L.Ed.2d 668 (1976)). Even if these comments carried the weight claimed by supporters of a private right of action, they support such a right only for injured investors, not issuers such as plaintiff here. *See* 430 U.S. at 32, 97 S.Ct. at 944. On the other hand, the statement in the House Report that the Williams Act "avoids tipping the balance of regulation either in favor of management or in favor of the person making a takeover bid," H.R.

Rep. No. 1711, *supra*, at 3, U.S.Code Cong. & Admin.News 1968, at p. 2813, weighs against implication. A private cause of action for injunctive relief in the hands of management would tip the balance in its favor, providing a powerful weapon for delay and perhaps defeat of a takeover attempt. Since Congress "expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which create potential for such attempts," *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975), the legislative history does not support an implied private right of action under section 13(d).

Consideration of the legislative scheme to determine Congressional intent is the third *Cort* factor. The principle of neutrality discussed above is a significant aspect of this consideration. The act was designed to maintain neutrality in takeover attempts, favoring neither the target corporation nor the person making the takeover bid. As reasoned above, then, this aspect of the legislative scheme does not support an implied right of action. Further, the Court in *Touche Ross* refused to recognize a private right of action on behalf of customers of an insolvent brokerage house under § 17(a) when the express remedy provided in § 18(a) for misstatements contained in § 17(a) reports "is limited to persons who, in reliance on the statements, purchased or sold a security whose price is affected by the statements." 442 U.S. at 572, 99 S.Ct. at 2487.[3] The Court stated, "we are extremely reluctant to imply a

---

**3.** Section 18(a) of the Securities Exchange Act, codified at 15 U.S.C. § 78r(a), provides as follows:

> (a) Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading)

who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.

cause of action in § 17(a) that is significantly broader than the remedy that Congress chose to provide." *Id.* at 574, 99 S.Ct. at 2488. The same express remedy relied on by the Court in *Touche Ross* is applicable to misstatements in a Schedule 13D. Section 18(a) of the Securities Exchange Act, codified at 15 U.S.C. § 78r(a), creates a right of action in purchasers or sellers of securities who relied on material false or misleading statements in "any application, report, or document filed pursuant to this chapter," including a Schedule 13D. In addition, Congress gave the SEC express authority to bring suit for an injunction or writ of mandamus for violations of § 13(d). 15 U.S.C. § 78u(d)–(e). Like the Court in *Touche Ross,* this court is extremely reluctant to imply a cause of action in § 13(d) on behalf of issuing corporations, which would be significantly broader than the express remedies Congress chose to provide.

The fourth *Cort* factor is consideration of whether the cause of action is traditionally one relegated to state law. However, since plaintiff's cause of action has failed to pass the first three tests from *Cort,* the court need not consider the fourth. *Transamerica,* 444 U.S. at 23–24, 100 S.Ct. at 249–250.

In spite of the relevance of the restrictive analysis of implied rights of action mandated recently by the Supreme Court in *Touche Ross* and *Transamerica,* plaintiff relies heavily on two more recent Supreme Court cases, *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). In *Curran,* the Court found an implied right of action under the Commodity Exchange Act (CEA) on two grounds: (1) since it was clear that an implied cause of action under the CEA was a part of the "contemporary legal context" in which Congress undertook a comprehensive reexamination and amendment of the CEA in 1974, the fact that Congress left intact the provisions under which the courts had in-

ferred the cause of action is evidence that Congress intended to preserve that remedy; and (2) the legislative history supported a congressional intent to preserve the remedy. *Huddleston* affirmed the implication of a private right of action under section 10(b) and rule 10b–5 upon similar grounds: the fact that Congress left section 10b intact when it enacted in 1975 the "most substantial and significant revision of this country's federal securities laws since the passage of the Securities Exchange Act," suggests that Congress intended to retain the private right of action "consistently recognized for more than 35 years." 103 S.Ct. at 689, 687.

Both cases strongly support the rationale of *Touche Ross* and *Transamerica*—the existence of a private right of action depends on the intent of the legislature. The two new cases merely added another factor to consider in determining legislative intent: the "contemporary legal context" in which Congress reexamines and amends existing statutes. The present case is easily distinguished from *Curran* and *Huddleston.* In the first place, both Supreme Court cases involved statutes prohibiting specific conduct for the benefit of the plaintiff, thus meeting the statutory language test of *Touche Ross. See* p. 510, *supra.* Section 13(d), on the other hand, is a reporting provision much like section 17(a) in *Touche Ross.* Second, both statutes in *Curran* and *Huddleston* were extensively revised at a time when an implied right of action was unanimously recognized by the courts under each statute, and it is clear that Congress, in considering the revisions, was aware of this "contemporary legal context." In contrast, the Williams Act has never been "extensively" revised, and even when certain minor strengthening revisions were made in 1970 and 1977, the legal contexts were far different from those in which the CEA and Securities Exchange Act were revised. In 1970, just two years after the Williams Act was originally passed, the courts had not yet begun to recognize a private right of action under

section 13(d).[4] By the time of the second amendment in 1977, Pub.L. No. 95–213, § 202, 91 Stat. 1494 (1977), the Supreme Court had decided *Cort*, which drastically changed the standards by which implied rights of action would be scrutinized, and Congress was on notice that if it intended a right of action it should affirmatively manifest that intent.[5] Further, the implication of an implied right of action under section 13(d) was never recognized so universally as was the CEA cause of action in 1974 and the 10b–5 cause of action in 1975. Hence, the factor used in *Curran* and *Huddleston* to determine Congressional intent to provide implied rights of action offers no help to plaintiff in showing Congressional intent to provide such a right of action under section 13(d).

Plaintiffs contend that an implied right of action under 13(d) is necessary to effectuate the purposes of the Williams Act to protect investors because the overburdened SEC simply has inadequate resources to police the Williams Act provisions.[6] The Supreme Court, however, has rejected this argument as irrelevant to the determination of Congressional intent to provide a right of action. *Touche Ross*, 442 U.S. at 575, 99 S.Ct. at 2488; *Piper*, 430 U.S. at 41, n. 27, 97 S.Ct. at 949, n. 27. This court agrees with the separation of legislative and judicial functions implicit in the *Touche Ross* decision. Perhaps it is true that the purpose of the Williams Act and particular-

ly section 13(d) will not be fully realized until issuers—who receive a copy of the Schedule 13D and have the information to assess its accuracy—are enabled to enforce this section through a right of action in federal courts. Such a determination is the function of Congress, however, not this court. To infer a private right of action on the basis of need alone, without any indication that Congress intended so, is a legislative act, not a judicial one. Further, to infer a right of action in order to accommodate one purpose of the act (provide information to investors) would, for the reasons stated herein, frustrate another purpose of the act (maintain neutrality between the target corporation and the person attempting the takeover.) Balancing these interests is also a legislative function. This court, therefore, will not infer a private right of action merely because the SEC deems it "necessary" to realize fully the purposes of the act.

## II. NO STANDING UNDER SECTION 10(b)

■ The complaint does not allege that plaintiff either purchased or sold any of the securities involved in the transactions in connection with which defendants allegedly committed fraud. In 1975 the Supreme Court held that only actual purchasers or sellers of securities have standing to bring an action for damages under Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539

---

**4.** The Second Circuit was the first to recognize an implied right of action under section 13(d) in 1971. *GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir.1971).

**5.** Indeed, in 1980, citing *Cort v. Ash*, Congress did affirmatively manifest such intent in passing the Small Business Investment Incentive Act of 1980, Pub.L. No. 96–477, 94 Stat. 2275 (1980). In the House Report of the bill enacting that statute, the Committee stated Congress' intent:

> to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and such actions would not improperly occupy an area traditionally the concern of state law.

H.R. No. 1341, 96th Cong.2d Sess. 29, *reprinted in* [1980] U.S.Code Cong. & Ad.News 4800, 4811.

**6.** Recently the SEC has submitted amicus briefs arguing that because of the lack of SEC resources to enforce the provisions of the Williams Act, the court should recognize an implied right of action under section 13(d). Brief of the Securities Exchange Commission, *Amicus Curiae, Indiana National Corp. v. Rich*, 712 F.2d 1180 (7th Cir.1983) (appeal from *Indiana National Corp. v. Rich*, 554 F.Supp. 864 (S.D.Ind. 1982)); Brief of the Securities Exchange Commission, *Amicus Curiae, Liberty National Insurance Holding Co. v. The Charter Co.*, No. 82–7260 (11th Cir., filed Aug. 23, 1982) (appeal from *Liberty National Insurance Holding Co. v. Charter Co.*, [1982] Fed.Sec.L.Rep. (CCH) ¶ 98,671 (N.D.Ala. Aug. 13, 1982.))

(1975). There is some question whether the rule in *Blue Chip Stamps* also applies to suits in equity for injunctive relief. Prior to *Blue Chip Stamps* an injunctive relief exception to the purchaser-seller rule was widely recognized, including in the Tenth Circuit. *See, e.g., Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir.1967); *Landy v. FDIC*, 486 F.2d 139 (3d Cir.1973); *Vincent v. Moench*, 473 F.2d 430 (10th Cir.1973). It is a legitimate question whether this exception survives the *Blue Chip Stamps* decision, a question which the Tenth Circuit has expressly reserved for future determination. *See Westinghouse Credit Corp. v. Bader & Dufty*, 627 F.2d 221, 223 (10th Cir.1980). Several courts have held that issuers have no standing to bring a 10b–5 cause of action based on fraudulent misrepresentations or omissions in a Schedule 13D, but these courts allowed a private right of action under section 13(d). *Dan River Inc. v. Icahn*, 1983 Fed.Sec.L.Rep. (CCH) ¶ 99,043 at 94,959 (4th Cir.1983); *Liberty National Insurance Holding Co. v. Charter Co.*, 1982 Transfer Binder Fed.Sec.L.Rep. (CCH) ¶ 98,671 at 93,372 (N.D.Ala.1982); *Financial General Bankshares v. Lance*, 1978 Transfer Binder Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,430 (D.D.C.1978). *See also, GAF Corporation v. Milstein*, 453 F.2d 709, 721–22 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), *Nicholson File Co. v. H.K. Porter Co.*, 341 F.Supp. 508, 521 (D.R.I.1972), *aff'd*, 482 F.2d 421 (1st Cir.1973); *Treadway Companies, Inc. v. Care Corp.*, 490 F.Supp. 660, 665–66 (S.D.N.Y.), *aff'd in part rev'd in part*, 638 F.2d 357 (2d Cir. 1980); *Krueger Co. v. Kirkpatrick Pettis, etc.*, 466 F.Supp. 800, 805 (D.Neb.1979).

This court believes that policy reasons similar to those relied on in *Blue Chip Stamps* exist in this case to deny standing to plaintiffs under 10b–5. In *Blue Chip Stamps* the Court expressed concern that if standing were given to other than purchasers or sellers of securities, many "strike" suits based on oral testimony would result. Such a suit, even if it is without merit, could have a substantial settlement value because of the nuisance it poses to the defendant. 421 U.S. at 741–43, 95 S.Ct. at 1928–29. Of particular concern to the court was the abuse of the liberal federal discovery rules. Similar concerns are raised in this case. As soon as a Schedule 13D is filed, entrenched management can use a suit for an injunction, with voluminous discovery requests,[7] for its delay value to defeat any takeover attempt, regardless of the merits of the case. To grant standing to issuers under 10b–5 to seek an injunction based on alleged misstatements or omissions in a Schedule 13D would violate some of the same policy considerations present in *Blue Chip Stamps*. Under these circumstances the rule in *Blue Chip Stamps* limiting standing to purchasers and sellers should apply. Accordingly, the cause of action under Rule 10b–5 must be dismissed.

### III. NO JURISDICTION OVER COMMON LAW CLAIM

Plaintiff's third claim for relief is a common law claim based on a future breach of a future fiduciary duty. Although it is unlikely that plaintiff has stated a valid claim under this theory, this court need not decide this issue. Since this court is dismissing Equity's federal claims under the Securities Exchange Act, this state common law claim should also be dismissed for lack of subject matter jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *McMann v. Northern Pueblos Enterprises*, 594 F.2d 784, 786 (10th Cir.1979).

Accordingly,

IT IS HEREBY ORDERED that the complaint be dismissed.

---

7. "On the same day as Equity filed its complaint, it served Consolidated with notice that it would take the depositions of thirteen Consolidated officers and directors plus the vice president of one of Consolidated's banks. (These depositions have been deferred by stipulation filed with this court on January 25, 1983)." Memorandum in Support of Defendants' Motion for Dismissal of the Complaint and Partial Summary Judgment, at 19, n. 9.